## UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| VICTIM SERVICES, INC., NATIONAL CORRECTIVE GROUP, INC., and MATS JONSSON, 910 CALLE NEGOCIO, SUITE 300 SAN CLEMENTE, CA 92673 | : : : : : : | Misc. Action No.: 1:17-cv-2431 |
| Petitioners, | : : : | **Related to:** |
| vs. | : : : | **Case No. 3:14-cv-05266 (N.D. Cal.)** **Case No. 1:15-cv-00899 (D. Md.)** |
| CONSUMER FINANCIAL PROTECTION BUREAU, 1275 FIRST STREET, N.E. WASHINGTON, D.C. 20002 | : : : : : : : | |
| Respondent. | : : | |

### MOTION TO COMPEL CONSUMER FINANCIAL PROTECTION BUREAU
### TO COMPLY WITH PROPERLY-SERVED SUBPOENA
### AND INCORPORATED MEMORANDUM OF LAW

Petitioners Victim Services, Inc. ("VSI"), National Corrective Group, Inc. ("NCG"), and

Mats Jonsson ("Jonsson") (collectively, the "Petitioners"), through their counsel, respectfully

move for an order, pursuant to Fed. R. Civ. P. 45, to compel compliance by Respondent Consumer

Financial Protection Bureau (the "CFPB") with a subpoena *duces tecum* (the "Subpoena") issued

in connection with a putative class action currently proceeding in the United States District Court

for the Northern District of California (the "Putative Class Action").  This request is brought in

this Court because the place of compliance provided by the Subpoena was within the District of

Columbia, which is less than 100 miles from the CFPB's place of business.  As reflected in the

1

certification set forth below, the parties met and conferred in good faith via telephone, but were unable to resolve the issues which form the basis of this motion.

## <u>INTRODUCTION</u>

Petitioners are defendants in the Putative Class Action.  Plaintiffs in the Putative Class Action seek, among other things, restitution of allegedly "unlawful" fees paid to Petitioners in connection with Petitioners' administration of bad check diversion programs for District Attorneys' Offices in the State of California.  The Subpoena directs the CFPB to produce a limited set of documents that are highly relevant to Petitioners' defenses in the Putative Class Action – namely, that allowing the putative class to proceed with its claims for restitution would result in an impermissible double recovery under the well-settled law of the United States Supreme Court and the Ninth Circuit Court of Appeals.  The CFPB has already awarded monetary restitution to the members of the putative class in the Putative Class Action.  The Subpoena seeks information related to that monetary restitution, which the CFPB has refused to supply.  As set forth more fully below, the CFPB has refused to comply with any portion of the Subpoena.  To date:

- The CFPB has failed to produce a single document responsive to the Subpoena and, based on correspondence and discussions with the CFPB, no documents are forthcoming; and

- The CFPB has not filed a motion to quash or a motion for protective order in this Court, where compliance is required under Rule 45(c).

Because the CFPB's failure to comply with the Subpoena is unreasonable, Petitioners respectfully request the issuance of an order directing: (1) the production of all documents called for in the Subpoena; (2) the establishment of a date certain for compliance with the Subpoena; and (3) that the CFPB reimburse Petitioners for the costs expended in compelling its compliance with

a lawfully-issued and properly-served subpoena, including attorneys' fees.

## BACKGROUND

### 1.  The Putative Class Action

California Penal Code section 476a makes the writing of a bad check a crime, punishable by up to one year in prison.  Cal. Pen. Code, § 476(a), (c).  In 1985, the California Legislature enacted the Bad Check Diversion Act ("BCDA") as part of its efforts to remedy the growing epidemic of bad check writing.  Cal. Pen. Code, §§ 1001.60 *et seq.*  The BCDA expressly authorizes BCDPs to be administered by private entities "under contract with the district attorney." *Id.*, § 1001.60.

American Corrective Counseling Services, Inc. ("ACCS") is a former administer of BCDPs for various District Attorneys in California. Pursuant to certain written agreements, as expressly authorized by the BCDA, ACCS assisted the District Attorneys with the administration of the BCDPs by providing educational seminars, consulting, and administrative support services. In April 2009, NCG acquired the operating assets of ACCS. As a result, ACCS's contracts (collectively the "Services Agreements") were assigned to NCG, and NCG assumed responsibility for the administration of the BCDPs for ACCS.  Since approximately June 6, 2014, the Services Agreements have been administered by VSI, as a result of VSI's acquisition of the operating assets of NCG.  Jonsson was the last CEO of NCG, and is the Chief Financial Officer of VSI.

A BCDP is a pre-charge diversion program.  *See* Cal. Pen. Code, § 1001.66.  After an offender writes a bad check and the victim attempts unsuccessfully to collect payment over an extended period of time, the victim files a crime report with the District Attorney. The bad check writer is referred to the BCDP only if the crime report meets objective eligibility criteria justifying criminal prosecution as established by the District Attorney.

After eligibility is confirmed, an official notice is then generated, offering the bad check offender an opportunity to avoid criminal prosecution by voluntarily participating in an educational seminar addressing the causes and prevention of bad check writing.  The notice is approved, authorized by, and sent on behalf of the District Attorney pursuant to the Services Agreement.

If the bad check offender chooses to participate in the BCDP, he or she must pay certain authorized fees, including a fee for the educational class, and full restitution to the victim.  Cal. Pen. Code, § 1001.64.

On February 6, 2015, Plaintiffs Kevin Breazeale, Karen Solberg, Kevin Hiep Vu, Nancy Morin, and Narisha Bonakdar filed their operative First Amended Complaint in the Putative Class Action, alleging four counts against Petitioners for violations of: (1) the federal Fair Debt Collections Practices Act ("FDCPA"); (2) California's Unfair Competition Law; (3) fraudulent misrepresentation; and (4) and negligent misrepresentation.  *See* Exhibit 1 to Declaration of Sean M. Hardy ("Hardy Decl.").  The Putative Class Action Plaintiffs seek restitution for themselves and the putative class relative to all fees paid to the Petitioners by those who participated in California BCDPs during the putative class period, which is defined as December 1, 2010 to the present.  *See* Hardy Decl., Ex. 1., ¶¶ 125, 139, 151, 156, and Prayer for Relief.  Plaintiffs in the Putative Class Action assert that restitution for these fees constitutes no less than "millions of dollars."  *Id.*

The Putative Class Action has not yet reached the class certification stage, as Petitioners presently have two interlocutory appeals pending before the Ninth Circuit Court of Appeals.

## 2.  The CFPB Action

After an extensive civil investigation by the federal CFPB, a stipulated judgment and

consent decree was entered against Petitioners on March 31, 2015, immediately following the filing of a complaint alleging violations of the FDCPA in the United States Court for the District of Maryland (the "CFPB Action").  The CFPB's March 30, 2015 complaint against Petitioners alleged several counts for alleged violations of: (1) the Consumer Financial Protection Act; and (2) the FDCPA.  *See* Hardy Decl., Ex. 2.  As part of the CFPB Action, the CFPB sought monetary restitution on behalf of a nationwide class of consumers, including California consumers, who paid fees to Petitioners relative to their participation in BCDPs.  *Id.,* ¶¶ 85 and Prayer for Relief.

Among other things, this consent judgment enjoined Petitioners from violating the FDCPA by: (1) ceasing any unfair, deceptive, or abusive acts or practices in connection with the operation of a BCDPB; (2) ceasing any representation to consumers, expressly or by implication, that they are a District Attorney, including through the use of a letterhead or facsimile signature of a District Attorney, "provided, however, that [Petitioners] may reference the District Attorney in communications with consumers if they clearly and conspicuously state that [Petitioners] are a private company administering the pre-trial bad check diversion program on behalf of the District Attorney;" (3) clearly and conspicuously informing consumers in all communications that the communication is from the applicable Petitioner; (4) ceasing administration of a BCDP unless the District Attorney or an employee of the District Attorney authorized to make such a determination provides a written verification that: (a) he or she has performed a review and determined that probable cause of a bad check violation exists relative to that consumer; (b) he or she has determined that contact with the alleged offender for purposes of participation in the BCDP is appropriate; (c) he or she has determined that the alleged offender failed to pay the bad check after demand for payment was made; and (d) the District attorney has met all applicable state law prerequisites for inclusion in the BCDP; and (5) including a clear and conspicuous statement in

the initial communication to any consumer that the District Attorney has not decided whether to charge the consumer with a crime and that many cases are never prosecuted.  *See* Hardy Decl., Ex. 3, ¶ 8.

Of critical importance to the instant Motion, as part of the settlement of the CFPB Action, the CFPB provided monetary restitution to consumers who received allegedly deceptive communications from Petitioners through the CFPB's Civil Penalty Fund, which pools the civil penalties collected in CFPB enforcement actions.[1]  In order for the CFPB to make restitution to bad check writers in the CFPB Action, Petitioners provided the CFPB with spreadsheets identifying each person, by name and address, who had paid money to BCDPs throughout the nation.  The CFPB used the identifying data provided by Petitioners to locate the recipients of its restitution checks, as well as the amount of those restitution checks.

The CFPB has admittedly paid restitution to those California check writers who form the bulk of the putative class in the Putative Class Action.  Indeed, discovery has revealed that, on December 14, 2015, the CFPB issued a $241 check to Narisha Bonakdar, a named plaintiff in the Putative Class action. *See* Hardy Decl., Ex. 4.  The CFPB's letter to Ms. Bonakdar, on CFPB letterhead and signed by CFPB Director Richard Cordray, stated that "[e]nclosed is money you're receiving because of a legal settlement between National Corrective Group, Inc. and the CFPB." *Id.*  The letter clearly informed the recipient that the enclosed check was a "refund of some of the fees you paid for a bad-check diversion program from National Corrective Group, Inc. (NCG) or one of its related companies[.]" *Id.*  Indeed, the CFPB informed recipients of its restitution checks that, "[t]he enclosed check is money we are refunding to you for some of the fees you paid to that

---

[1] *See* http://files.consumerfinance.gov/f/201512_cfpb_v-national-corrective-group-inc.pdf

program." *Id.* Ms. Bonakdar paid $248.50 in fees to a California BCDP, of which $7.50 consisted of a "returned check fee." *See* Hardy Decl., Ex. 1, ¶ 112. California law specifically allows up to $50 to be charged for a "returned check fee," which explains why the CFPB refunded Ms. Bonakdar a total of $241. *See* Cal. Pen. Code, § 1001.65(a). In short, Ms. Bonakdar has already received full restitution for all the fees that she could lawfully recover in the Putative Class Action.

Thus, all California bad check writers between July 21, 2011 and March 30, 2015 (the CFPB Action's settlement period) have already been substantially compensated for any allegedly "unlawful" fees paid to Petitioners. However, although the CFPB has publicized its restitution efforts on its website and in press releases, it has inexplicably refused to share with Petitioners – the parties that supplied the CFPB with the data which enabled it make restitution – with such basic information as the total amount of restitution paid to California bad check writers or the names of those bad check writers that received restitution.

### 3. The Subpoena

Petitioners have made extraordinary efforts to avoid the instant Motion, by engaging in a considerate and patient meet and confer process with the CFPB. On January 4, 2016, counsel for Petitioners made an informal request to CFPB enforcement attorney James Meade for information regarding the CFPB's restitution payments to California bad check writers. *See* Hardy Decl., Ex. 5, pp. 3-4. On January 29, 2016, CFPB enforcement attorney Zol Rainey responded by stating that the CFPB would not supply such information informally. *Id.* at p. 3. Mr. Rainey then suggested that Petitioners issue a subpoena for this information, but warned "[i]f you subpoena the requested information it will be reviewed and it is likely that the ultimate recommendation would be for the CFPB to resist the subpoena." *Id.* On February 1, 2016, Mr, Rainey indicated that CFPB attorney Kristin Bateman was authorized to accept service of this subpoena. *Id.* at p. 2.

That same day, Ms. Bateman stated that the CFPB's General Counsel had delegated the authority to accept subpoenas to attorneys in the CFPB's Legal Division, such as Ms. Bateman. *Id.* at p. 1.

On February 2, 2016, counsel for Petitioners spoke with Ms. Bateman on the telephone regarding the scope of the proposed subpoena. *Id.* During this telephone call, Ms. Bateman confirmed that the CFPB had issued restitution checks to those California BCDP participants that had been identified by Petitioners in the spreadsheets sent to the CFPB. *Id.* Petitioners' counsel explained that this information was relevant to the Petitioners' defenses in the Putative Class Action, as it directly related to whether the putative class would receive an impermissible double recovery if allowed to receive further "restitution." *Id.* Ms. Bateman stated that the CFPB would likely object to and oppose any subpoena issued by Petitioners in connection with the Putative Class Action. *Id.* Given the CFPB's stated opposition to any subpoena, and the substantial attorneys' fees and costs Petitioners would need to incur to respond to the CFPB's opposition, Petitioners refrained from serving a subpoena while they pursued a court-ordered mediation in the Putative Class Action. *Id.*

The September 29, 2016 mediation ended up being unsuccessful, and Petitioners served the Subpoena on the CFPB on October 4, 2016. *See* Hardy Decl., Ex. 6. The Subpoena sought the following five categories of documents from the CFPB:

(1) All documents that relate to the payment of monies to persons in California related to the CFPB Action;

(2) All communications between the CFPB and participants in California bad check programs related to the CFPB Action;

(3) All documents that relate to the total amount of money paid by the CFPB to persons in California who participated in bad check programs;

(4) All documents that relate to the total amount of money paid by the CFPB to persons in California who received letters from, but did not participate in, bad check programs; and

(5) All documents that relate to the payment of monies to persons in California related to the CFPB Action on or after March 31, 2015.  *Id.*

On October 18, 2016, via e-mail, the CFPB purported to serve objections to the Subpoena pursuant to Fed. R. Civ. P. 45(d)(2)(B).[2]  *See* Hardy Decl., Ex. 7.  A copy of these objections was later received by UPS.  *Id.*  On December 28, 2016, Petitioners' counsel sent a detailed meet and confer letter to the CFPB, discussing why applicable authorities demonstrated that the CFPB's objections were without merit.  *See* Hardy Decl., Ex. 8.  The CFPB never provided a written response to this detailed meet and confer letter.  *Id.*

On January 12, 2017, Petitioners' counsel engaged in a telephonic meet and confer with Ms. Bateman of the CFPB.   *See* Hardy Decl., Ex. 9.  During this call, Ms. Bateman stated that, while she would do her best to be cooperative, the CFPB would not willingly comply with the Subpoena and Petitioners would need to file a motion to compel, which the CFPB would oppose. *Id.*  This position was reiterated during a further call on January 19, 2017.  *Id.*

At no time did the CFPB file a motion to quash or motion for a protective order with respect to the Subpoena.

## **ARGUMENT**

### 1.  **The Subpoena Seeks Documents Relevant to the Putative Class Action**

---

[2] The undersigned counsel never consented, pursuant to Rule 45, to accepting an objection to the Subpoena via e-mail.  *See, e.g., Robinson-Reeder v. Am. Council on Educ.*, 626 F. Supp. 2d 11, 19 n.8 (D.D.C. 2009) (denying plaintiff's request to serve documents on opposing counsel by email where "neither party has represented that such consent was ever sought by plaintiff or given by defendant.").

In the letter from the CFPB dated October 18, 2016, the CFPB purported to serve six generalized objections to the Subpoena.  The CFPB's first objection is that the documents sought by the Subpoena are not relevant to the Putative Class Action.  This objection is objectively without merit.

It has long been that law that relevance "has been construed broadly to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case." *Oppenheimer Fund v. Sanders*, 437 U.S. 340, 351 (1978).  Moreover, a court with jurisdiction over a discovery dispute for an action pending in a different district should resolve all doubts concerning relevance in favor of permissive discovery. *Flanagan v. Wyndham Int'l*, 231 F.R.D. 98, 103 (D.D.C. 2005).

"[I]t is settled that a subpoena is limited in scope by Rule 26(b)(1) of the Federal Rules of Civil Procedure." *Coleman v. D.C.*, 275 F.R.D. 33, 36 (D.D.C. 2011) (citations omitted).  Under Rule 26(b)(1), "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense." Fed. R. Civ. P. 26(b).  "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401.  Again, this definition is broadly construed for purposes of discovery. *Food Lion v. United Food & Commercial Workers Int'l Union*, 103 F.3d 1007, 1012 (D.C. Cir. 1997).

Petitioners are not only defendants in the Putative Class Action, but were also defendants in the CFPB Action, which sounded in claims that Defendants had violated, among other statutes, the FDCPA through their administration of district attorneys' bad check diversion programs in multiple states, including California. In connection with the settlement of the CFPB Action, Petitioners provided the CFPB with Microsoft Excel Spreadsheets containing the identifying

information of every check writer who paid money to VSI or NCG between July 1, 2011 and

March 30, 2015, in order for the CFPB to reimburse these check writers for monies paid to VSI or

NCG.  The CFPB subsequently contracted with Epiq Systems, Inc. to administer payments to

eligible check writers and answer their questions.  Based on the admission of CFPB attorney

Kristin Bateman during a February 2, 2016 telephone call with Petitioner's counsel, it is known

that the CFPB has issued refunds to numerous individuals in California who paid monies to VSI

or NCG between July 1, 2011 and March 30, 2015.

Like the CFPB Action, the Putative Class Action also sounds in violations of the FDCPA

based on the Petitioners' administration of BCDPs in California.  In the Putative Class Action, the

putative class includes, without limitation, individuals in California who paid money to Defendants

from December 1, 2010 to the present.  That group seeks (among other things) restitution for

allegedly unlawful fees paid to Petitioners.  Moreover, the putative class in the Putative Class

Action is identical to those California check writers who have received refunds from the CFPB.

Plaintiffs' counsel in the Putative Class Action have been provided through discovery with Excel

Spreadsheets containing the identifying information of every California check writer who paid

money to Petitioners between December 1, 2010 to the present.  This is the same identifying

information which Petitioners provided to the CFPB, and which the CFPB used to identify

recipients of settlement funds in the CFPB Action.  There is complete overlap between the

members of putative class and those California individuals that the CFPB has issued refunds to in

the CFPB Action.

The Subpoena is thus clearly relevant to both Plaintiffs' claims for restitution, as well as

Petitioners' defenses to Plaintiffs' claims for restitution.  To the extent the putative class members

who have received a full refund from the CFPB now seek additional restitution in this Action, such

would constitute an impermissible double recovery. "It is axiomatic that final, court-approved settlements preclude class members from seeking the same relief for the same claims a second time." *See California v. IntelliGender, LLC*, 771 F.3d 1169, 1180 (9th Cir. 2014) (enjoining State of California from seeking restitution on behalf of consumers where same class of persons were already entitled to restitution under private class action settlement based on the same claims); *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 297 (2002) ("[I]t goes without saying that the courts can and should preclude double recovery by an individual."). Therefore, this information will be highly relevant for the district court's determination of whether to grant class certification to the putative class, as well as my clients' defenses to the Plaintiffs' claims for restitution.

The *Intelligender* decision in particular makes this information relevant, as this Ninth Circuit case is binding on the district court in the Putative Class Action. In April 2012, a federal court approved the settlement of a class action against Intelligender, sounding in violations of California's unfair competition law and false advertising law. *IntelliGender, LLC*, 771 F.3d at 1175. As part of the settlement, the class members could receive a $10 restitution check by submitting a valid claim form. *Id.* Later, in July 2012, the State of California filed a civil action against IntelliGender for violations of California's unfair competition law and false advertising law. *Id.* The State sought an injunction as well as civil penalties, restitution, and other remedies. *Id.* The Ninth Circuit held that the State should properly be enjoined from seeking restitution on behalf of its injured citizens, as this would result in an improper double recovery. *Id.* at 1179-81. The Ninth Circuit based its decision on the obvious fact that there was no difference between the persons on whose behalf the State sought restitution and the certified class in the prior settlement. *Id.* at 1179. The *Intelligender* court held that it was irrelevant that the State sought a different, greater amount of restitution than the restitution ordered in the class action settlement. *Id.* at 1180,

n. 9.   The Ninth Circuit astutely noted that this "merely confirms that the State is essentially seeking a double (or at least better) recovery." *Id.* at 1180.   While the State could pursue other remedies in its civil action, it was barred from seeking additional restitution.  *Id.* at 1182.

The situation here is on all fours with *Intelligender.*   The CFPB, pursuant to a court-approved settlement, issued restitution checks to all California bad check writers between July 1, 2011 and March 30, 2015.   However, absent the CFPB's compliance with the Subpoena, Petitioners will be unable to present evidence of this fact to the district court in the Putative Class Action.   This information is necessary in the near term, in order for Petitioners to oppose the Plaintiffs' upcoming motion for class certification.   Petitioners, in opposing class certification, are entitled to demonstrate why *Intelligender* counsels against the district court allowing the restitution claims in the Putative Class Action to proceed on a class-wide basis.   Only the CFPB possesses the data necessary for Petitioners to support this argument.   The relevance of the information is straightforward by any measure, and especially so under the liberal standard of discovery.

### 2.   The Subpoena Is Not Overbroad Or Unduly Burdensome

The CFPB's purported burdensomeness objection is likewise without merit and does not justify non-production under the federal rules.

"This Court only entertains an unduly burdensome [or overly broad] objection when the responding party demonstrates how the document is request is 'overly broad, burdensome, or oppressive, by submitting affidavits or offering evidence which reveals the nature of the burden.'" *Thong v. Andre Chreky Salon*, 247 F.R.D. 193, 197 (D.D.C. 2008) (internal citations omitted). "The burden of proving that a search for information would be unduly burdensome is on the party requesting relief from the subpoena." *Linder v. Calero-Portcarrero*, 180 F.R.D. 168, 173 (D.D.C. 1998); *see also Irons v. Karceski,* 74 F.3d 1262, 1264 (D.C. Cir. 1995) (stating that "the party

seeking to quash a subpoena bears a heavy burden of proof") (citation omitted); *In re Subpoena Duces Tecum to AOL, LLC,* 550 F. Supp. 2d 606, 612 (E.D. Va. 2008) ("When a non-party claims that a subpoena is burdensome and oppressive, the non-party must support its claim by showing how production would be burdensome.").

Despite **ample** opportunity, the CFPB failed to explain or otherwise substantiate its boilerplate objection at any time.  This failure alone renders the objection without merit.  *Ht S.R.L. v. Velasco*, 125 F. Supp. 3d 211, 227 n.17 (D.D.C. 2015) ("Because Respondent simply stated the objections in his May 6, 2015 e-mail without explanation, his objections were improper.").  The information requested in the Subpoena should be readily available in the CFPB's files, as well as the files of the CFPB's agent, Epiq Systems, Inc.  The CFPB only began issuing refunds in the CFPB Action on or after March 31, 2015, so the documents requested are not remote in time.  Given the E-Government Act of 2002, it would be expected that such recent documents are stored digitally, rather than as paper copies.  The CFPB has provided no basis to support its conclusory objection that compliance with the Subpoena would constitute an undue burden.

The CFPB failed to explain how the Subpoena would concern privileged material or material that is "protected from disclosure in discovery," as the documents sought by the Subpoena relate to payments made by the CFPB to third parties in California.  As described above, to the extent any of these documents contain "personally identifiable information" concerning California check writers, **Petitioners provided that information to CFPB in the first place**.

Additionally, during the meet and confer process, Petitioners' counsel made clear that Petitioners are not seeking internal CFPB memoranda and legal opinions.  Rather, Petitioners seek the basic information concerning which persons received refund checks and the amounts of those checks.  The Putative Class Action only concerns individuals who participated in California Bad

14

Check Programs.  Petitioners are not seeking information related to persons who participated in Bad Check Programs in other states.  Despite requesting that the CFPB provide evidence to support its burdensome objection, the CFPB failed to do so.

Although courts have discretion to limits discovery, neither Rule 26 nor Rule 45 provide the CFPB with the unilateral rights to declare document requests to be overbroad or unduly burdensome and then refuse to comply with the Subpoena.  The CFPB has not moved in this Court for a protective order or moved to quash the Subpoena.  For the foregoing reasons, the Court should overrule these objections as meritless and compel the CFPB to fully comply with the Subpoena.

### 3.  The Subpoena Does Not Seek Privileged Information Or Work Product

The CFPB likewise has no proper basis for its putative objection that the Subpoena seeks documents protected by the attorney-client privilege and the work product doctrine.  The Subpoena does not seek inter-agency or intra-agency memorandums or letters related to legal advice.  To the extent the CFPB construed the Subpoena in such a manner, Petitioners' counsel expressly disavowed such a construction during the meet and confer process.  Moreover, "only attorney-client communications themselves, not the underlying facts, are privileged."  *FTC v. Boehringer Ingelheim Pharms., Inc.*, 180 F. Supp. 3d 1, 16 (D.D.C. 2016).  The facts regarding which California check writers received monies from the CFPB in connection with the CFPB Action, as well as the amounts of those payments, are not privileged.

The CFPB admits it has not conducted a search of the responsive documents to determine if any basis exists for the CFPB's privilege objection.  "The basis of [a] privilege must be adequately established in the record, through evidence  sufficient . . . to establish the privilege . . . with reasonable certainty." *In re Subpoena Duces Tecum Issued to Commodity Futures Trading Comm'n*, 439 F.3d 740, 750 (D.C. Cir. 2006) (alterations in original) (quotation marks omitted).

This requires the party asserting privilege to "adduce competent evidence in support of its claims," something beyond "conclusory statements, generalized assertions, and unsworn averments of its counsel." *In re Veiga*, 746 F. Supp. 2d 27, 33-34 (D.D.C. 2010). "Rule 45(d)(2) is generally satisfied by the submission of a privilege log detailing each document withheld and the reason." *In re Subpoena Duces Tecum*, 439 F.3d 740, 751 (2006). The CFPB failed to submit a privilege log of any kind to support this purported objection.

Petitioners' counsel confirmed to the CFPB that the Subpoena does not seek inter-agency or intra-agency memorandums or letters related to legal advice. During the meet and confer process, the CFPB acknowledged this fact, which Petitioners' counsel then confirmed by email. As such, the Court should respectfully overrule this objection as meritless and compel the CFPB to fully comply with the Subpoena.

### 4. The Subpoena Does Not Implicate The Privacy Act

The CFPB raised the purported objection that the Subpoena implicates the Privacy Act and, furthermore, that this insulates the CFPB from compliance with the Subpoena. First, the CFPB failed to identify what privacy rights are implicated by the Subpoena. Second, as discussed above, Petitioners provided the CFPB with the names and addresses of all persons the CFPB eventually issued refunds to in the CFPB Action – Petitioners simply lack the means of verifying which California individuals received refunds, as well as the amounts of those refunds. It was made clear to the CFPB that a protective order has been entered in the Putative Class Action to protect any potential privacy or confidentiality concerns. Moreover, this protective order is, in fact, the model protective order of the Northern District of California – one of the most stringent and comprehensive in the Ninth Circuit. Petitioners' cover letter, served alongside the Subpoena,

included a copy of the protective order and an invitation to contact Petitioners' counsel with any questions regarding potential privacy concerns. However, rather than meeting and conferring on specific issues, the CFPB served straight objections to the entire Subpoena.

Nearly thirty years ago, the D.C. Circuit addressed this issue directly, in no uncertain terms. "The Privacy Act, however, does not create a qualified discovery privilege as that concept is generally understood, and we find no basis in the statute or its legislative history for inferring one. Nor does the Act create any other kind of privilege or bar that requires a party to show actual need as a prerequisite to invoking discovery." *Laxalt v. McClatchy*, 809 F.2d 885, 888 (1987). Indeed, the D.C. Circuit made clear that the Federal Rules of Civil Procedure trump the Privacy Act. *Id.* at 889 ("We therefore hold that a party can invoke discovery of materials protected by the Privacy Act through the normal discovery process and according to the usual discovery standards, and the test of discoverability is the relevance standard of Rule 26(b)(1) of the FRCP."). The *Laxalt* court further held that a protective order is sufficient to alleviate a party's Privacy Act concerns. *Id.* at 889-90 ("As we have noted in the past, such traditional devices as protective orders and *in camera* inspection offer reliable means with which to give effect to liberal discovery principles without threatening the interests protected by statutory publication bans[.]").

### 5. The Subpoena Does Not Impose An Additional "Privacy Act" Burden

There is likewise no merit to the CFPB's conclusory objection that the Privacy Act requires the agency to provide notice to each individual who received a refund based on their participation in a California bad check diversion program. The *Laxalt* court held that while the Privacy Act contains a generalized notice provision at 5 U.S.C. § 552a(e)(8), the Privacy Act permits agencies to exempt records from the notice provision. *Laxalt*, 809 F.2d at 887 n. 14. Like other

federal agencies, the CFPB expressly exempts large portions of its records from the Privacy Act. *See* 12 C.F.R. § 1070.60.  This broad exemption includes information contained in the CFPB's Enforcement Database, as well as "information compiled for civil actions or proceedings[.]"  12 C.F.R. § 1070.60(a)-(b).  The information requested by the Subpoena falls within this exemption. The CFPB Action was a civil action or proceeding, and the CFPB Action was an enforcement action.  The refunds issued to the California check writers were part of the settlement in the CFPB Action, and the CFPB specifically referenced this fact in its letters to the check writers.

The CFPB's bald reference to 12 C.F.R. § 1070.59 is entirely unavailing.  The regulation provides:

> The CFPB will not disclose any record about an individual contained in a system of records to any person or agency without the prior written consent of that individual unless the disclosure is authorized by 5 U.S.C. 552a(b). ***Disclosures authorized by 5 U.S.C. 552a(b) include disclosures that are compatible with one or more routine uses that are contained within the CFPB's Systems of Records Notices***, which are available on the CFPB's Web site, at http://www.consumerfinance.gov.
> 12 C.F.R. § 1070.59 (emphasis added).

An examination of the CFPB's Systems of Records Notices demonstrates that the CFPB's own regulations authorize disclosure of the requested information to Petitioners.  The Systems of Records Notice CFPB.025 is titled "Civil Penalty Fund and Bureau-Administered Redress Program Records."  CFPB.025 is codified in the Federal Register at 78 FR 34991.  The CFPB describes the broad range of information available in its Civil Penalty Fund and Bureau-Administered Redress Program Records:

> Records in this system may contain identifiable information about individuals including, without limitation: (1) ***Name***, address, email address, phone number and other contact information; (2) Social Security number (SSN), age, date of birth, marital status, records of consumer financial transactions, financial account information, and internal identification number assigned to identified victims; (3) ***accounting and financial information relevant to making payment***; and (4) ***accounting and financial information relevant to determining when and in what***

***amounts victims have claimed funds***. Additionally, non-identifying information in the system may include the dates the Bureau authorized, instituted, settled, and/or otherwise obtained a final judgment in a judicial or administrative action; an internal case tracking number; the date the judicial or administrative order was entered; the date the judicial or administrative order became a "final order" as defined by the Consumer Financial Civil Penalty Fund Rule, 12 CFR Part 1075; ***the amount of civil penalties or redress ordered***; the due date for payments of civil penalties and redress funds; ***the date and amount of payments made***; the status of debt collection efforts; and the balances of the Bureau's accounts as payments are made.
78 FR 34991, 34993 (emphasis added).

These records therefore contain the documents responsive to the Subpoena. Critically, CFPB.025 provides that these records may be disclosed to "[a]n entity or person that is the subject of a judicial or administrative action resulting in an order to pay civil penalties or redress to the Bureau, and the attorney or non-attorney representative for that entity or person[.]" 78 FR 34991, 34993. It is undisputed, and indisputable, that Petitioners fall within this category. CFPB.025 also demonstrates that these records "are retrievable by a variety of fields including, but not limited to, individual name, address, financial account number, internal identification number assigned to identified victims, or by some combination thereof." *Id.* The requirement that these records be retrievable through a variety of search fields weighs against the CFPB's claim that it would be "burdensome" to search its own records. In short, 12 C.F.R. § 1070.59 not only does not justify the CFPB's refusal to comply with the Subpoena, it demonstrates that the CFPB's internal policies would allow for the disclosure of the requested information to Petitioners as a "routine use" under CFPB.025. *See* 78 FR 34991, 34993.

Further, the CFPB's objection that it would be unduly burdensome and expensive to provide notice to potentially affected individuals is deficient for the reasons outlined above – the CFPB has given no indication as to how many individuals would potentially be affected by the Subpoena, and what the potential cost would be even if notice were needed. This alone

demonstrates that the CFPB raised this objection before confirming whether there was any merit to the objection.

Moreover, Petitioners only seek the following information concerning those persons that participated in California Bad Check Programs and were sent refunds by the CFPB: (1) their names; (2) the total amount that the person paid to the California Bad Check Program; (3) the total amount of the check the CFPB sent to the person; (4) the date on which the check was deposited/cleared; and (5) any checks that were returned to the CFPB or otherwise not deposited. Petitioners are not seeking the addresses or telephone numbers of such persons (although Petitioners would have such information anyway), and the CFPB is well aware that a comprehensive protective order has been entered in this case. In sum, there is no justification for this objection. The Court should overrule it and order the CFPB to comply with the Subpoena.

### 6.  The Federal Rules of Civil Procedure Trump the CFPB's Agency Regulations

Finally, there is no merit to the CFPB's objection that compliance with the Subpoena is unnecessary because Petitioners should have first followed the CFPB's rules concerning requests for information. This purported objection is particularly obnoxious, as the CFPB specifically instructed Petitioners' counsel to serve a subpoena for the requested information, after rejecting an informal request for the same. The CFPB's internal regulations concerning requests for information were not mentioned as either a prerequisite or a corollary to the issuance of a subpoena. The CFPB's insistence otherwise is contrary to the law of this Court.

The CFPB's reference to *United States ex rel. Touhy v. Ragen*, 340 U.S. 462, 468 (1951) is unavailing. This Court in *SEC v. Selden*, 484 F. Supp. 2d 105, 106 (D.D.C. 2007) ordered the FDA to comply with a subpoena after it had moved to quash on the basis that the subpoenaing

party had failed to comply with the FDA's regulations concerning requests for documents.  This Court noted that, "*Touhy* in no way stands for the proposition that agency regulations alter the procedures set forth in the Federal Rules of Civil Procedure or that agency regulations can preclude the production of documents that are relevant to a judicial proceeding." *Selden,* 484 F. Supp. 2d at 107 (internal quotes omitted).  It is settled law that "[t]he means by which parties issue subpoenas on the government, and the applicable legal standards governing compliance, ***are governed by the Federal Rules of Civil Procedure***." *Id.* at 109 (emphasis added).  There is no objection that Petitioners failed to comply with the Federal Rules of Civil Procedure.  The Subpoena was properly served on the CFPB, consistent with applicable federal law.

As discussed above, the records requested by the Subpoena are plainly relevant to the claims and defenses in the Putative Class Action.  Further, the CFPB is the only entity in possession and control of the documents responsive to the Subpoena.  There is simply no other means by which Petitioners can obtain this relevant information.  This Court should overrule this objection and order the CFPB to comply with the Subpoena.

### CONCLUSION

For all the aforementioned reasons, and despite Petitioners' best efforts to reach an understanding, the CFPB has unreasonable failed to comply with the Subpoena.  Accordingly, Petitioners respectfully request that the Court enter an order:

- Compelling the CFPB to produce the documents requested in the Subpoena; and

- Entering an award of the reasonable attorneys' fees and costs incurred by Petitioners in enforcing the CFPB's compliance with the Subpoena.

Dated:  November 10, 2017

/S/ Terrence M. McShane
Terrence M. McShane, Esquire, #429683
Arthur T. K. Norris, Esquire, #438907
Lee & McShane, P.C.
1211 Connecticut Avenue, N.W., Suite 425
Washington, DC  20036
Tel: (202) 530-8100


/S/ Sean M. Hardy, Esquire
Sean M. Hardy, Esquire
(pro hac vice pending)
Freedman & Taitelman, LLP
1901 Avenue of the Stars, Suite 500
Los Angeles, CA 90067
Tel: (310) 201-0005


*Counsel for Petitioners Victim Services, Inc.,*
*National Corrective Group, Inc., and Mats Jonsson*


## Certification Pursuant to Fed. R. Civ. P. 37(a)(1) and LCvR 7.1(m)

The undersigned hereby certifies that, on January 12, 2017 and January 19, 2017, Kristin Bateman of the Consumer Financial Protection Bureau and myself conducted a telephonic meet and confer regarding the issues set forth in this Motion.  However, despite good faith efforts, the parties were unable to resolve their disputes.

/S/ Sean M. Hardy, Esquire
Sean M. Hardy, Esquire
Freedman & Taitelman, LLP
1901 Avenue of the Stars, Suite 500
Los Angeles, CA 90067
Tel: (310) 201-0005